UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL MARCEL CARTER,

        Plaintiff,

v.

JAMIE AYALA and
ROBERT DAVIS,

        Defendants.
_____/

Case No. 1:13-cv-807

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner held at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. This matter is now before the Court on defendant Dr. Ayala's "Motion to dismiss based solely upon failure to exhaust administrative remedies" (docket no. 21) and plaintiff's "Motion for summary judgment and opposition in response to defendants [sic] motion for summary judgment" (docket no. 30).

    **I.**    **Plaintiff's complaint**

Plaintiff's complaint is directed at two defendants, psychiatrist Dr. Jamie Ayala ("Dr. Ayala"), and psychologist Mr. Robert Davis ("Mr. Davis"). Compl. at ¶ 7 (docket no. 1).[1] Plaintiff's complaint includes the following allegations. Defendants were employed by the State of Michigan as mental health officials at Ionia Correctional Facility (ICF), were "employees, agents and/or representatives" of the MDOC, and performed duties "as medical and corrections officials acting pursuant to and under the color of law." *Id.* at ¶¶ 7-8.

---

[1] The Court notes that in a subsequently filed affidavit, Mr. Davis stated that he was employed by the MDOC as a clinical social worker. *See* Robert Davis Aff. (docket no. 34-2).

Plaintiff suffers from multiple sclerosis. *Id.* at ¶ 9. In 2009, while housed at the Marquette Branch Prison (MBP), he was diagnosed with "Psychosis disorder due to medical condition." *Id.* at ¶ 10. Upon plaintiff's transfer to ICF, his assigned case manager and psychologist, Mr. Davis, notified plaintiff that due to his major mental disorder (MMD), plaintiff could not be subjected to long-term segregation "and that [p]laintiff would be 'appealed' back into the 'Secure Status Outpatient Treatment Program,' ('SSOTP') for mental health treatment." *Id.* at ¶ 11. According to plaintiff,

> The SSOTP is a mental program designed for the therapeutic management and care of prisoners who are placed in segregation who suffer from a major mental disability, which may preclude adequate adjustment in segregation and assist towards the goal of managing these prisoners in general population. (See MDOC Policy Directive 04.06.182).

*Id.* at ¶ 11.[2]

Plaintiff was admitted into "the mental health program" at ICF. *Id.* at ¶ 12. However, he refused treatment "in fear of his health and safety of officers" who worked with the mentally ill prisoners in the SSOTP unit. *Id.* Plaintiff was asked to enter the program on two subsequent occasions, but refused to participate. *Id.* On July 27, 2010, Mr. Davis went to plaintiff's

---

[2] MDOC Policy Directive 04.06.182 ¶ D provides as follows:

> Prisoners with a mental disability ordinarily should not be housed in segregation if the disability may preclude adequate adjustment in segregation. The Department has more appropriate mental health care settings which are designed for the therapeutic management and care of these prisoners; for example, inpatient psychiatric hospitalization, Residential Treatment Programs (RTPs) including the Adaptive Skills Residential Program (ASRP), and the Secure Status Outpatient Treatment Program (SSOTP). Some prisoners with mental disabilities, however, cannot be managed outside of a segregation unit without presenting a serious threat to their own safety or the safety of staff or other prisoners. While in segregation, such prisoners must be closely followed by the institution Outpatient Mental Health Team (OPMHT) or a QMHP to ensure their mental health needs are continuing to be met.

cell and told plaintiff that "if your [sic] not going to consent to participate in SSOTP, I'll be sure that you see the doctor." *Id.* at ¶ 13. Plaintiff responded that "I have a constitutional right to refuse treatment, you don't care about my safety, I told you officers are going to jump me over there again." *Id.* Shortly after Mr. Davis left plaintiff's cell door, Dr. Ayala approached the cell and stated that Davis "referred me to re-evaluate you." *Id.* at ¶ 14. Plaintiff's meeting with Dr. Ayala "lasted less than three minutes." *Id.* After the meeting, Dr. Ayala changed plaintiff's diagnosis to an anxiety disorder "with no explanation of why he was discontinuing Plaintiff's prescribed treatment and therapy for his Psychosis Disorder." *Id.* By changing plaintiff's diagnosis, Dr. Ayala "made [p]laintiff ineligible for mental health therapy, and subjected [p]laintiff to punitive detention and administrative segregation." *Id.*

Approximately two months later, on September 22, 2010, Mr. Davis told plaintiff that, according to Dr. Ayala, plaintiff "was ineligible for the mental health program because he refused treatment, not because he [Dr. Ayala] downgraded Plaintiff's diagnosis." *Id.* at ¶ 15. Mr. Davis later stated that plaintiff was ineligible for both reasons "but more because you were admitted to the SSOTP and you refused to go several times." *Id.*

On September 23, 2010, plaintiff asked Dr. Ayala if he could change plaintiff's diagnosis back to the original psychosis disorder. *Id.* at ¶ 16. Plaintiff promised Dr. Ayala that he would be compliant with treatment and attend SSOTP therapy, because he needed to be provided with proper treatment for his psychosis and released from segregation." *Id.* According to plaintiff,

> Defendant AYALA then stated that, the reason he changed Plaintiff's diagnosis was because of Plaintiff's "previous non-compliance" with SSOTP therapy, and that "if your Case Manager agree [sic] to give you a second chance in the SSOTP, I'll be glad to re-consider a more favorable diagnosis." Plaintiff replied "your [sic] the Psychiatrist, you make the diagnosis not my psychologist." Defendant AYALA stated that Defendant DAVIS recommended re-evaluation and

3

> that Plaintiff should develope [sic] a better relationship with his psychologist if he want [sic] a favorable diagnosis that will make him eligible for the program.

*Id.*

Plaintiff notified Mr. Davis "numerous times that he will be compliant with treatment and that he was ready to leave segregation because segregation exacerbated the symptoms of his mental illness" and Davis "repeatedly promised that he was going to speak to Dr. Ayala and have Plaintiff's diagnosis corrected." *Id.* at ¶ 17. However, neither Mr. Davis nor Dr. Ayala corrected "their unlawful actions." *Id.*

Approximately eight months later, in May 2011, plaintiff experienced an exacerbation of his multiple sclerosis and severe symptoms of his psychosis. *Id.* at ¶ 18. On May 29, 2011, plaintiff attempted to commit suicide. *Id.* Dr. Thomas Henry, a psychiatrist, found that plaintiff's "clinical status was worsening" and that plaintiff "suffered from paranoia, delusions, and suicidal behavior, along with sleeping and eating problems." *Id.* Dr. Henry diagnosed plaintiff with a psychosis disorder and recommended that he enter a residential treatment program "for intensive mental health treatment." *Id.* On June 16, 2011, plaintiff was transferred to an inpatient mental health facility and released from segregation. *Id.*

According to plaintiff, defendants' act of downgrading his diagnosis based on his refusal to enter a mental health program caused him to be subjected to segregation for 11 months, to suffer severe mental anguish and emotional pain, and to suffer a substantial risk of harm to his mental health. *Id.* at ¶ 19.

Plaintiff's complaint has alleged two causes of action. In Count 1, plaintiff alleged that defendants retaliated against him in violation of the First Amendment. Specifically,

> At all times relevant, pursuant to the 1st Amendment of the United States Constitution, and clearly established law, Plaintiff had a right to engage in constitutionally protected conduct when refusing mental health treatment, and not be subjected to retaliation. Plaintiff suffered an adverse action when Defendants AYALA and DAVIS intentionally downgraded Plaintiff's diagnosis for the sole purpose [sic] to deny him prescribed treatment and subject him to segregation.

*Id.* at ¶ 25.

In Count 2, plaintiff alleged that defendants were deliberately indifferent to his serious medical needs in violation of the 8th Amendment. Specifically, plaintiff alleged that:

> At all times relevant, pursuant to the 8th Amendment of the United States Constitution, and clearly established law, Plaintiff had a right not to be subjected [sic] cruel and unusual punishment. Defendants AYALA and DAVIS acted with deliberate indifference when denying Plaintiff already prescribed treatment, when they intentionally switched Plaintiff's diagnosis. Defendants AYALA and DAVIS knew Plaintiff was suffering from a "Psychosis Disorder["], knew they were intentionally misdiagnosing Plaintiff, and knew their treatment was otherwise grossly inadequate but proceeded with treatment anyway when treating Plaintiff for an "Anxiety Disorder." Defendants AYALA and DAVIS knew that housing Plaintiff in segregation would increase his risk of relapse and/or exacerbate the symptoms of his mental illness.

*Id.* at ¶ 27. Plaintiff seeks monetary damages and declaratory relief. *Id.* at p. 9.

## II. Plaintiff's Count 1 fails to state a claim on which relief can be granted

As an initial matter, the Court should *sua sponte* dismiss plaintiff's Count 1 for failure to state a claim pursuant to 28 U.S.C. § 1915(2)(B)(2), which provides that "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . (B) the action or appeal . . . (ii) fails to state a claim on which relief may be granted[.]" In Count 1, plaintiff has alleged that defendants retaliated against him in violation of his First Amendment rights. To prove a First Amendment retaliation claim, a plaintiff must establish three elements: "1) the plaintiff engaged in activities protected by the Constitution or statute; 2) the defendant took an adverse action that would deter a person of ordinary firmness

from continuing to engage in that conduct; and 3) that this adverse action was taken at least in part because of the exercise of the protected conduct." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). *See also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

Here, plaintiff failed to establish the first element of the First Amendment retaliation claim because he did not engage in conduct protected by the First Amendment. *See Thaddeux-X*, 175 F.3d at 393-96. Rather, plaintiff claims that Dr. Ayala retaliated against him because plaintiff exercised his right to refuse medical treatment, a right which arises from the Due Process Clause of the Fourteenth Amendment. *See, e.g., Washington v. Harper*, 494 U.S. 210, 221-2, 229 (1990) (recognizing that a prison inmate with a serious mental illness has a constitutionally-protected liberty interest in avoiding the unwanted administration of antipsychotic drugs and concluding that an inmate "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment"); *Noble v. Schmitt*, 87 F.3d 157, 161 (6th Cir.1996) ("[t]he Supreme Court has held that individuals in state custody enjoy protectable liberty interests to be free from bodily restraint, and to refuse medical treatment such as the administration of antipsychotic drugs"). Plaintiff has failed to allege a necessary element of a retaliation claim under the First Amendment, the home of such claims. He cannot stretch this claim to encompass rights found in the Due Process Clause of the Fourteenth Amendment. Accordingly, plaintiff's retaliation claim alleged in Count 1 should be dismissed pursuant to 28 U.S.C. § 1915(2)(B)(2)(ii) for failure to state a claim.

### III. The parties dispositive motions

### A. Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Dr. Ayala has moved to dismiss plaintiff's action for lack of exhaustion. While the doctor's motion seeks dismissal pursuant to Fed. R. Civ. P. 12(b)(6), his supporting brief specifically asks the court to "grant him summary judgment due to Plaintiff's failure to exhaust administrative remedies." *See* Brief at p. 9 (docket no. 21-1). Given that Dr. Ayala has submitted documents outside of the pleadings (including an affidavit), and has requested a grant of summary judgment, the Court construes this motion as one for summary judgment brought pursuant to Fed. R. Civ. P. 56. In response to this motion, plaintiff filed his own motion for summary judgment on the issue of exhaustion.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

> (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Failure to Exhaust

#### 1. Exhaustion requirement

The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust

available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

### 2. MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3. Plaintiff failed to properly exhaust his claim

Dr. Ayala contends that plaintiff did not properly exhaust a grievance with respect to the matters alleged in this action. The Court agrees. Plaintiff has alleged only two interactions with Dr. Ayala: a conversation on July 27, 2010, when the doctor changed plaintiff's diagnosis to an anxiety disorder; and a conversation on September 23, 2010, when the doctor told plaintiff the reasons why his diagnosis was changed.

Dr. Ayala points out that there is no record that plaintiff filed a grievance which specifically related to the doctor's interactions with plaintiff on either July 27, 2010 or September 23, 2010. The doctor notes that plaintiff filed a grievance on September 16, 2010, regarding an incident that occurred on September 11, 2010. *See* Grievance No. ICF 2010-09-2299-12B1 ("2299") (docket nos. 1-1 and 30-1). Plaintiff relies on Grievance No. 2299 as the basis for his lawsuit. *Id.*

Plaintiff's Grievance No. 2299 seeks relief based on the following complaints. Plaintiff suffered from multiple sclerosis which caused him to have hallucinations and hear things, resulting in a diagnosis with a "psychiatric disorder due to medical condition." After receiving a misconduct on an unspecified date, plaintiff was placed in segregation and then placed in the SSOPT

program because MDOC policy prohibited housing mentally ill prisoners in segregation. While in the SSOPT program, plaintiff was attacked by an officer and taken out of the program. Mental health staff appealed and plaintiff was approved to re-enter the program. Plaintiff refused to re-enter SSOPT, telling Mr. Davis that he was afraid of the officer that had attacked him. About one month later, plaintiff refused a second order to enter the program for the same reason. After plaintiff learned that the officer was no longer at the SSOPT program, he told Mr. Davis that he was willing to go to the program. However, Mr. Davis told plaintiff that he was no longer eligible for SSOPT because his diagnosis was changed to a less severe "mood disorder," a diagnosis which was not eligible for SSOPT. Plaintiff claimed that his constitutional rights were violated because: (1) he had a right to mental care for his severe mental illness; (2) plaintiff was retaliated against for refusing treatment 3 times by changing his diagnosis to a less-severe diagnosis making him ineligible for SSOPT care; and (3) plaintiff had a right to refuse medical treatment at the time because he was in fear of his safety. *Id.*

The substance of Grievance No. 2299 is that on September 11, 2010, Dr. Ayala and Mr. Davis denied plaintiff mental health treatment and retaliated against him in violation of the First Amendment. As an initial matter, plaintiff's grievance did not (and in fact could not) address his claim against Dr. Ayala which arose twelve days later on September 23, 2010. However, it is not entirely clear whether the grievance involved plaintiff's claim that Dr. Ayala changed his diagnosis on July 27, 2010. As discussed, plaintiff's grievance recounted events which occurred at least one month prior to September 11, 2010. An undated grievance response appeared to acknowledge a relationship between the July 27, 2010 diagnosis and the September 11, 2010 incident, stating in pertinent part that "it was learned that Prisoner Carter had a comprehensive psychiatric evaluation

11

completed in July of this year," that "a determination was made that the diagnosis would not fall in the category of a Major Mental Disorder diagnosis as defined in the Correction's Mental Health Program," and that "[a]lthough he alleges that this was done for retaliatory reasons, this is not supported by the evidence." *Id.* (docket no. 1-1 at p. 5). Based on this record, the Court concludes that a genuine issue of material fact exists as to whether Grievance No. 2299 involved Dr. Ayala's alleged change of diagnosis which occurred on or about July 27, 2010.

Assuming that Grievance No. 2299 addressed the July 27, 2010 claim, plaintiff did not properly exhaust that grievance. Dr. Ayala has presented the affidavit of Richard D. Russell, Manager of the Grievances Section for the MDOC, Office of Legal Affairs, in which Mr. Russell stated that plaintiff did not pursue this grievance through Step III. *See* Richard Russell Aff. at ¶¶ 1-5 (docket no. 21-3). After performing a search of the grievance records for plaintiff, Mr. Russell stated that the only grievance which plaintiff pursued through Step III of the grievance process at ICF between March 2009 and March 2011, was Grievance No. ICF-10-04-1092-26a ("1092"). *Id.* at ¶ 5. This grievance referred to a different matter, i.e., an allegation that Resident Unit Officer Mawer attacked plaintiff on April 21, 2010, and that supervisory staff failed to take appropriate action. *See* Grievance No. 1092 (docket no. 21-4).

In his cross-motion for summary judgment, plaintiff contends that he exhausted Grievance No. 2299 against Dr. Ayala and Mr. Davis. *See* Plaintiff's Motion (docket no. 30). In a declaration made pursuant to 28 U.S.C. § 1746, plaintiff stated that "[o]n January 6, 2011, I filed a Step III Appeal with the MDOC Director's Office by depositing it in the mailbox." *See* Joel Carter Aff. at ¶ 6 (docket no. 30-1). Plaintiff has submitted a copy of a grievance form for a Step III Appeal which provides the following reason for appeal, "Grievant re-states and re-alleges the facts

in Step I." Grievance No. 2299 (docket no. 1-1 at p. 7).  In his affidavit, plaintiff stated that he followed up on the grievance on February 12, 2011, when he "mailed a letter to Director's Office [sic] inquiring into the non-response to my Step III Grievance Appeal."  Joel Carter Aff. at ¶ 6. Plaintiff has filed a copy of the February 12, 2011 letter which he claims was mailed to the Director's Office regarding grievance no. 2299.  *See* Letter (Feb. 12, 2011) (docket no. 30-1 at p. 12).  This letter, which is marked "RE: Step III Appeal Decision," does not identify any particular grievance.

Viewing the factual evidence and drawing all reasonable inferences in favor of the nonmoving party (plaintiff), the Court concludes that plaintiff did not properly exhaust Grievance No. 2299.  While plaintiff states in his affidavit that he mailed the Step III grievance to the "Director's Office," this action was not the appropriate method for filing a Step III grievance. Under the MDOC Policy Directives,

> A grievant may file a Step III grievance if s/he is dissatisfied with the Step II response or does not receive a timely response.  To file a Step III grievance, **the grievant must send a completed Step III grievance**, using the Prisoner/Parolee Grievance Appeal form (CSJ-247B), **to the Grievance and Appeals Section** within ten business days after receiving the Step II response or, if no response was received, within ten business days after the date the response was due, including any extensions.

MDOC Policy Directive 03.02.130 ¶ FF (emphasis added).

Policy Directive 03.02.130 further provides that "[t]he Grievance and Appeals Section shall be the respondent for Step III grievances on behalf of the Director" and is responsible for logging the grievances into a computerized grievance tracking system, forwarding grievances regarding health care issues to the Administrator of the Bureau of Health Care Services, and "ensur[ing] that any additional investigation is completed as necessary for each Step III grievance

13

accepted, including referral to the Internal Affairs Division and, for disability issues, to the Equal Employment Opportunity Office within the Bureau of Human Resources, as appropriate, and that a copy of the Step III response is provided to the grievant." *Id.* at ¶ GG. While plaintiff stated that he mailed the Step III grievance to the "Director's Office," this action was not sufficient to file a Step III grievance. There is no evidence that plaintiff properly exhausted the grievance by sending a copy of the Step III grievance to the Grievance and Appeals Section as required by Policy Directive 03.02.130 ¶ FF. Indeed, as demonstrated by Mr. Russell's affidavit, there is no record that such a grievance was filed.

Furthermore, plaintiff filed this action against Dr. Ayala prior to receiving a Step III response. The PLRA provides that "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The exhaustion requirement is mandatory and applies to all suits regarding prison conditions, regardless of the nature of the wrong or the type of relief sought. *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. Thus, a prisoner "may not exhaust administrative remedies during the pendency of the federal suit." *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir.1999). Based on this record, plaintiff did not properly exhaust a grievance against Dr. Ayala prior to filing this action. *Jones*, 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91; *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Freeman*, 196 F.3d at 645. Accordingly, Dr. Ayala's motion for summary judgment (docket no. 21) should be granted and plaintiff's motion for summary judgment (docket no. 30) should be denied.

### IV.    Recommendation

For the reasons set forth above, I respectfully recommend that plaintiff's allegation of First Amendment retaliation set forth in Count 1 be **DISMISSED** for failure to state a claim pursuant to 28 U.S.C. § 1915(2)(B)(2)(ii).

I further recommend that Dr. Ayala's motion for summary judgment (docket no. 21) be **GRANTED**, that plaintiff's motion for summary judgment directed at Dr. Ayala (docket no. 30) be **DENIED**, and that Dr. Ayala be **DISMISSED** from this action.


Dated:  August 20, 2014                                      /s/ Hugh W. Brenneman, Jr.
                                                             HUGH W. BRENNEMAN, JR.
                                                             United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).