UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL MARCEL CARTER,

            Plaintiff,

v.

JAMIE AYALA and
ROBERT DAVIS,

            Defendants.

_____/

Case No. 1:13-cv-807

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. This matter is now before the Court on defendant Robert Davis' motion for summary judgment (docket no. 33) and plaintiff's "Motion for summary judgment and response to defendant Davis' motion for summary judgment" (docket no. 40).[1]

    **I.**        **Plaintiff's complaint**

Plaintiff's complaint is directed at two defendants, psychiatrist Dr. Jamie Ayala ("Dr. Ayala"), and psychologist Mr. Robert Davis ("Mr. Davis"). Compl. at ¶ 7 (docket no. 1). Plaintiff's complaint includes the following allegations. Defendants were employed by the State of Michigan as mental health officials at Ionia Correctional Facility (ICF), were "employees, agents

---

[1] Plaintiff's motion for summary judgment and opposition appear directed at defendant Davis, much as plaintiff's previously filed motion for summary judgment and opposition were directed at defendant Dr. Ayala. *See* Motion and Opposition (docket no. 30). For that reason, the Court construes plaintiff's present motion for summary judgment as directed against defendant Davis. The Court notes that Dr. Ayala filed a response to plaintiff's present motion (*see* docket no. 45) which pointed out that plaintiff's arguments regarding the doctor were addressed in a Report and Recommendation (docket no. 44).

and/or representatives" of the MDOC, and performed duties "as medical and corrections officials

acting pursuant to and under the color of law."  *Id.* at ¶¶ 7-8.

Plaintiff suffers from multiple sclerosis.  *Id.* at ¶ 9.  In 2009, while housed at the

Marquette Branch Prison (MBP), he was diagnosed with "Psychosis disorder due to medical

condition."  *Id.* at ¶ 10.  Upon plaintiff's transfer to ICF, his assigned case manager and

psychologist, Mr. Davis, notified plaintiff that due to his major mental disorder (MMD), plaintiff

could not be subjected to long-term segregation "and that [p]laintiff would be 'appealed' back into

the 'Secure Status Outpatient Treatment Program,' ('SSOTP') for mental health treatment."  *Id.* at

¶ 11.  According to plaintiff,

> The SSOTP is a mental program designed for the therapeutic management
> and care of prisoners who are placed in segregation who suffer from a major mental
> disability, which may preclude adequate adjustment in segregation and assist towards
> the goal of managing these prisoners in general population.  (See MDOC Policy
> Directive 04.06.182).

*Id.* at ¶ 11.[2]

Plaintiff was admitted into "the mental health program" at ICF.  *Id.* at ¶ 12.

However, he refused treatment "in fear of his health and safety of officers" who worked with the

---

[2] MDOC Policy Directive 04.06.182 ¶ D provides as follows:

> Prisoners with a mental disability ordinarily should not be housed in segregation if
> the disability may preclude adequate adjustment in segregation.  The Department has more
> appropriate mental health care settings which are designed for the therapeutic management
> and care of these prisoners; for example, inpatient psychiatric hospitalization, Residential
> Treatment Programs (RTPs) including the Adaptive Skills Residential Program (ASRP), and
> the Secure Status Outpatient Treatment Program (SSOTP).  Some prisoners with mental
> disabilities, however, cannot be managed outside of a segregation unit without presenting
> a serious threat to their own safety or the safety of staff or other prisoners.  While in
> segregation, such prisoners must be closely followed by the institution Outpatient Mental
> Health Team (OPMHT) or a QMHP to ensure their mental health needs are continuing to be
> met.

mentally ill prisoners in the SSOTP unit. *Id.* Plaintiff was asked to enter the program on two subsequent occasions, but refused to participate. *Id.* On July 27, 2010, Mr. Davis went to plaintiff's cell and told plaintiff that "if your [sic] not going to consent to participate in SSOTP, I'll be sure that you see the doctor." *Id.* at ¶ 13. Plaintiff responded that "I have a constitutional right to refuse treatment, you don't care about my safety, I told you officers are going to jump me over there again." *Id.* Shortly after Mr. Davis left plaintiff's cell door, Dr. Ayala approached the cell and stated that Davis "referred me to re-evaluate you." *Id.* at ¶ 14. Plaintiff's meeting with Dr. Ayala "lasted less than three minutes." *Id.* After the meeting, Dr. Ayala changed plaintiff's diagnosis to an anxiety disorder "with no explanation of why he was discontinuing Plaintiff's prescribed treatment and therapy for his Psychosis Disorder." *Id.* By changing plaintiff's diagnosis, Dr. Ayala "made [p]laintiff ineligible for mental health therapy, and subjected [p]laintiff to punitive detention and administrative segregation." *Id.*

Approximately two months later, on September 22, 2010, Mr. Davis told plaintiff that, according to Dr. Ayala, plaintiff "was ineligible for the mental health program because he refused treatment, not because he [Dr. Ayala] downgraded Plaintiff's diagnosis." *Id.* at ¶ 15. Mr. Davis later stated that plaintiff was ineligible for both reasons "but more because you were admitted to the SSOTP and you refused to go several times." *Id.*

On September 23, 2010, plaintiff asked Dr. Ayala if he could change plaintiff's diagnosis back to the original psychosis disorder. *Id.* at ¶ 16. Plaintiff promised Dr. Ayala that he would be compliant with treatment and attend SSOTP therapy, because he needed to be provided with proper treatment for his psychosis and released from segregation." *Id.* According to plaintiff,

Defendant AYALA then stated that, the reason he changed Plaintiff's diagnosis was because of Plaintiff's "previous non-compliance" with SSOTP

therapy, and that "if your Case Manager agree [sic] to give you a second chance in the SSOTP, I'll be glad to re-consider a more favorable diagnosis." Plaintiff replied "your [sic] the Psychiatrist, you make the diagnosis not my psychologist." Defendant AYALA stated that Defendant DAVIS recommended re-evaluation and that Plaintiff should develope [sic] a better relationship with his psychologist if he want [sic] a favorable diagnosis that will make him eligible for the program.

*Id.*

Plaintiff notified Mr. Davis "numerous times that he will be compliant with treatment and that he was ready to leave segregation because segregation exacerbated the symptoms of his mental illness" and Davis "repeatedly promised that he was going to speak to Dr. Ayala and have Plaintiff's diagnosis corrected." *Id.* at ¶ 17. However, neither Mr. Davis nor Dr. Ayala corrected "their unlawful actions." *Id.*

Approximately eight months later, in May 2011, plaintiff experienced an exacerbation of his multiple sclerosis and severe symptoms of his psychosis. *Id.* at ¶ 18. On May 29, 2011, plaintiff attempted to commit suicide. *Id.* Dr. Thomas Henry, a psychiatrist, found that plaintiff's "clinical status was worsening" and that plaintiff "suffered from paranoia, delusions, and suicidal behavior, along with sleeping and eating problems." *Id.* Dr. Henry diagnosed plaintiff with a psychosis disorder and recommended that he enter a residential treatment program "for intensive mental health treatment." *Id.* On June 16, 2011, plaintiff was transferred to an inpatient mental health facility and released from segregation. *Id.*

According to plaintiff, defendants' act of downgrading his diagnosis based on his refusal to enter a mental health program caused him to be subjected to segregation for 11 months, to suffer severe mental anguish and emotional pain, and to suffer a substantial risk of harm to his mental health. *Id.* at ¶ 19.

Plaintiff's complaint has alleged two causes of action.  In Count 1, plaintiff alleged that defendants retaliated against him in violation of the First Amendment.  Specifically,

> At all times relevant, pursuant to the 1st Amendment of the United States Constitution, and clearly established law, Plaintiff had a right to engage in constitutionally protected conduct when refusing mental health treatment, and not be subjected to retaliation.  Plaintiff suffered an adverse action when Defendants AYALA and DAVIS intentionally downgraded Plaintiff's diagnosis for the sole purpose [sic] to deny him prescribed treatment and subject him to segregation.

*Id.* at ¶ 25.

In Count 2, plaintiff alleged that defendants were deliberately indifferent to his serious medical needs in violation of the 8th Amendment.  Specifically, plaintiff alleged that:

> At all times relevant, pursuant to the 8th Amendment of the United States Constitution, and clearly established law, Plaintiff had a right not to be subjected [sic] cruel and unusual punishment.  Defendants AYALA and DAVIS acted with deliberate indifference when denying Plaintiff already prescribed treatment, when they intentionally switched Plaintiff's diagnosis.  Defendants AYALA and DAVIS knew Plaintiff was suffering from a "Psychosis Disorder["], knew they were intentionally misdiagnosing Plaintiff, and knew their treatment was otherwise grossly inadequate but proceeded with treatment anyway when treating Plaintiff for an "Anxiety Disorder."  Defendants AYALA and DAVIS knew that housing Plaintiff in segregation would increase his risk of relapse and/or exacerbate the symptoms of his mental illness.

*Id.* at ¶ 27.  Plaintiff seeks monetary damages and declaratory relief.  *Id.* at p. 9.

## II.    Count 1

In addressing Dr. Ayala's dispositive motion, the Court dismissed plaintiff's retaliation claim (Count 1) for failure to state a claim pursuant to 28 U.S.C. § 1915(2)(B)(2)(ii).  *See* Opinion and Order re Report and Recommendation (docket no. 48).  This ruling applied to both defendants named in Count 1.  However, to dispel any possible misunderstanding by the parties, Count 1 also failed to state a claim for relief against defendant Davis.  *See Id.*; Report and Recommendation (docket no. 44).

5

### III.   The parties' motions for summary judgment

### A.   Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

6

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.        Count 2 (Eighth Amendment claim)

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws.   *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984);  *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (l976).   A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  The objective component requires the infliction of serious pain or failure to treat a serious medical condition.  *Id.* at 8-9.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*  at 9.

7

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

## C.     Plaintiff's claim against defendant Davis

Both plaintiff and defendant Davis filed affidavits in this matter setting forth plaintiff's treatment history. Some of the background facts are not disputed. In 2009, a psychiatrist diagnosed plaintiff with psychosis disorder due to a medical condition (multiple sclerosis). Carter Aff. at ¶ 2 (docket no. 41-1); Davis Aff. at ¶ 4 (docket no. 34-2). Plaintiff was transferred to ICF in December 2009. Carter Aff. at ¶ 3. Defendant Davis was a clinical social worker (LMSW) assigned as plaintiff's case manager at ICF. *Id.* ; Davis Aff. at ¶¶ 1, 5. Plaintiff was treated at ICF for about one year, until his transfer to another correctional facility in January 2011. Davis Aff. at ¶ 5.

The controversy began in April 2010, when, according to plaintiff, he was placed in segregation after a corrections officer assaulted him and charged plaintiff with a misconduct for assault. Carter Aff. at ¶ 4. Davis advised plaintiff that he could not be housed in segregation and would be placed in SSOTP because of his mental health diagnosis. *Id.* Plaintiff was admitted to

SSOTP in May 2010. *Id.* When plaintiff was asked to move to the mental health unit, plaintiff told Davis that "[he] refused treatment because [he] was scared of the officers who worked around mentally ill prisoners in the SSOTP unit, including the officer who assaulted [him]." *Id.* at ¶ 5. Plaintiff was asked to enter the mental health program in June 2010 and July 2010, but refused because he feared for his health and safety. *Id.* at ¶ 6.

On July 27, 2010, Davis told plaintiff "if your [sic] not going to consent to participate in the SSOTP, I'll be sure that you see the doctor." *Id.* at ¶ 7. Plaintiff told Davis, "I have a right to refuse treatment." *Id.* Plaintiff also told Davis that the officers at the program might "jump him" as they did before. *Id.* About four hours later, the psychiatrist, Dr. Ayala, came to plaintiff's cell door and stated that Davis referred him to "re-evaluate" plaintiff. *Id.* at ¶ 8. Plaintiff stated that the evaluation lasted three minutes, that without explanation Dr. Ayala changed plaintiff's diagnosis from "psychosis disorder" to "anxiety disorder"; and that Dr. Ayala discontinued plaintiff's psychotropic medications of Abilify and Amitriptyline. *Id.*

Dr. Ayala's change of treatment made plaintiff ineligible for mental health therapy and subjected plaintiff to segregation for initially refusing mental health treatment. *Id.* at ¶ 8. Plaintiff attributes the change in treatment to *both* Dr. Ayala and Mr. Davis, stating that the treatment caused him mental anguish, severe depression, increased paranoia, delusions and hallucinations. *Id.* Plaintiff also referred to the change in treatment as "the denial of appropriate treatment." *Id.*

Plaintiff provides no facts for the period of July 27, 2010 until September 22, 2010, when plaintiff notified Davis that "Dr. Ayala told me that I was ineligible to be released from segregation and receive therapy because I refused treatment not because he changed my diagnosis."

9

*Id.* at ¶ 10.  Davis responded that plaintiff was ineligible for "both [reasons] but more because you were admitted to the SSOTP and you refused to go several times."  *Id.*

On September 23, 2010, plaintiff asked Dr. Ayala if he could change plaintiff's diagnosis.  *Id.* at ¶ 11.  "Ayala stated that the reason he changed my diagnosis was based on my 'previous non-compliance' with SSOTP therapy," and that "if your Case Manager agree [sic] to give you a second chance in the SSOTP, I'll be glad to re-consider a more favorable diagnosis."  *Id.*  Dr. Ayala then advised plaintiff, "to develope [sic] a better relationship with Davis if I want a favorable diagnosis."  *Id.*  Plaintiff promised Dr. Ayala that he would be compliant with treatment.  *Id.* at ¶ 11.  Plaintiff stated that he tried to develop a relationship with Davis as directed by Dr. Ayala, and repeatedly promised Davis that he would be compliant with treatment.  *Id.*  According to plaintiff, "Davis repeatedly promised me that he will have Ayala correct my diagnosis."  *Id.*  However, "[a]t no time did Davis and Ayala correct their unlawful actions and exercise their appropriate medical judgment."  *Id.*

In May 2011, after he transferred out of ICF, plaintiff experienced inflammation from the multiple sclerosis and severe symptoms of psychosis, including auditory and visual hallucinations.  *Id.* at ¶ 13.  On May 29, 2011, plaintiff attempted to commit suicide by hanging. *Id.*  On June 1, 2011, Dr. Henry found that plaintiff's clinical status was worsening, that he suffered from paranoia, delusions, hallucinations, suicidal behavior, sleeping problems and eating problems. *Id.* at ¶ 14.  Dr. Henry diagnosed plaintiff with Psychosis Disorder and recommended that plaintiff be admitted into a residential treatment program.  *Id.*  On June 16, 2011, plaintiff was transferred to an inpatient mental health treatment facility and later released from segregation.  *Id.*

Defendant Davis addressed the time frame of May 2010 through December 2010 as follows:

6.      On May 25, 2010, inmate Carter requested to go back to the SSOTP Program. However, on June 4, 2010 inmate Carter stated he did not want to go.  On June 10, he refused to be moved to the program site.  But then on July 1, inmate Carter stated he did want to go to the program.  On July 10 he again stated he was willing to go to the program.  On July 14, inmate Carter again verbalized willingness to go to the program, but wanted to wait until after his store items were delivered.  A medical record note on July 20, 2010 indicates that the plan was to move inmate Carter to the SSOTP program the following day, on July 21.  When seen by me later in the day on July 20, inmate Carter was ambivalent about going to the SSOTP program.  Inmate Carter's main focus during this time frame was to get himself a television despite knowing that he was not eligible for one because he had an extended period of "LOP" due to misconduct violations.

7.      Inmate Carter was seen by the team Psychiatrist on July 27,2010.  This was in follow up to a medication change by the Physician's Assistant on July 20.  I may have informed inmate Carter that the Psychiatrist would come see him, but the visit was not related to his refusal to participate in the program and this was not communicated nor implied to inmate Carter.  At that time it appeared that inmate Carter would enter the program voluntarily.

8.      Inmate Carter was seen by me on September 22,2010.  His prior refusal was noted, but this was not offered as a reason for the diagnosis change.  Diagnoses are neither ""downgraded" nor "upgraded."  Diagnoses are changed periodically on many patients due to clinical presentation.  I did not state the diagnosis was changed due to non-compliance.

9.      Inmate Carter continued to be seen weekly in segregation (as per policy) and documented such in the medical record, which is the primary mechanism for communicating with other health and mental health professional staff.  Inmate Carter's compliance with treatment is included in this documentation.  I did not, and would not, "promise to speak with the Psychiatrist and have the diagnosis corrected" as it was not considered to be incorrect.  The Psychiatrist saw inmate Carter on December 15, 2010 and did not change the diagnosis at that time.

Davis Aff. at ¶¶ 6-9.

Defendant Davis seeks summary judgment on the basis that he "was not directly responsible for the Plaintiff's diagnosis."  Defendant's Brief at p. ID# 163.  However, Davis does

not elucidate on either the evidence or legal arguments which support this claim. Davis' contention that he was not "directly" responsible for the diagnosis suggests, if not implies, that Davis had some responsibility for the diagnosis. While Davis points out that plaintiff had a significant amount of mental health treatment, plaintiff's level of treatment is not at issue in this lawsuit. Rather, the issue before the Court is whether defendant Davis was deliberately indifferent to plaintiff's serious medical needs, including his need for psychotropic medication. While this Court takes judicial notice that Davis is not a doctor licensed to prescribe medication, Davis has not clearly addressed what role, if any, he had in Dr. Ayala's decision to eliminate plaintiff's psychotropic medication. Defendant Davis' cryptic arguments that "[p]laintiff was seeking to use a mental health diagnosis as a 'get out of segregation' card" and that "plaintiff was put in administrative segregation due to the numerous misconducts he received, not because of any actions or inactions by Defendant Davis" does not address the issue. Based on this record, genuine issues of material fact exist with respect to defendant Davis' involvement in plaintiff's treatment, including the treatment which plaintiff received and the treatment which plaintiff refused.

Furthermore, the alleged Eighth Amendment violation is intertwined with plaintiff's right to refuse medical treatment, a right which arises from the Due Process Clause of the Fourteenth Amendment. *See, e.g., Washington v. Harper*, 494 U.S. 210, 221-2, 229 (1990) (recognizing that a prison inmate with a serious mental illness has a constitutionally-protected liberty interest in avoiding the unwanted administration of antipsychotic drugs and concluding that an inmate "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment"); *Noble v. Schmitt*, 87 F.3d 157, 161 (6th Cir.1996) ("[t]he Supreme Court has held that individuals in state custody enjoy protectable

liberty interests to be free from bodily restraint, and to refuse medical treatment such as the administration of antipsychotic drugs"). Defendant Davis does not address how plaintiff's right to refuse treatment affects his Eighth Amendment claim. *See Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 685 (7th Cir. 2012) ("[w]here, as in this case, a doctor's obligation to address his patient's serious medical needs conflicts with the patient's right to refuse treatment, the proper resolution of the conflict implicates the physician's medical judgment"). This legal issue requires further development. Accordingly, both parties' motions for summary judgment should be denied.

### D.    Qualified immunity

Davis contends that he is entitled to summary judgment on grounds of qualified immunity.

> Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from civil liability unless their conduct violates clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 816, 172 L.Ed.2d 565 (2009).

*Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir 2011). The Court may exercise its sound discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

While Davis claims that he is entitled to qualified immunity, he failed to develop or articulate a rationale to support this claim. Davis contends that he is entitled to qualified immunity "because there is insufficient evidence that he violated clearly established law," that plaintiff "has not supported his allegations with sufficient evidence," and that "[e]ven when the facts are viewed

13

in a light most favorable to Plaintiff, the actions or inactions of Defendant Davis were not objectively unreasonable." Defendant's Brief at pp. ID## 164, 166. As discussed, plaintiff's claim involves aspects of both an Eighth Amendment deliberate indifference claim and a Fourteenth Amendment right to refuse treatment claim. However, Davis does not identify the constitutional rights at issue or which of his "actions or inactions" are relevant to plaintiff's claim. Davis' cursory argument falls far short of establishing qualified immunity under the standard announced in *Bishop*, 636 F.3d at 765. A court need not make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments. *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995). "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Moreover, Davis' claim of qualified immunity should be denied on factual grounds because genuine issues of material fact exist with respect to plaintiff's claims. Accordingly, defendant Davis' qualified immunity claim should be denied.

### IV. Recommendation

For the reasons set forth above, I respectfully recommend that plaintiff's allegation of First Amendment retaliation set forth in Count 1 be **DISMISSED** for failure to state a claim pursuant to 28 U.S.C. § 1915(2)(B)(2)(ii).

I further recommend that defendant Davis' motion for summary judgment (docket no. 33) and plaintiff's motion for summary judgment (docket no. 40) be **DENIED**.


Dated:  March 30, 2015                              /s/ Hugh W. Brenneman, Jr.
                                                    HUGH W. BRENNEMAN, JR.
                                                    United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).