UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL MARCEL CARTER,

       Plaintiff,

Case No. 1:13-cv-807

Hon. Robert J. Jonker

v.

JAMIE AYALA and
ROBERT DAVIS,

       Defendants.
_____/

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. This matter is now before the Court on defendant Dr. Jamie Ayala's motion for summary judgment (docket no. 94), defendant Robert Davis' motion for summary judgment (docket no. 109), and plaintiff's "Supplemental Motion for summary judgement and response to defendants Davis and Ayala's motion for summary judgment" (docket no. 122).

    **I.**    **Plaintiff's complaint**

Plaintiff's complaint is directed at two defendants, psychiatrist Dr. Jamie Ayala ("Dr. Ayala") and social worker Mr. Robert Davis ("Mr. Davis"), both of whom worked at the Ionia Correctional Facility (ICF). Compl. (docket no. 1 at PageID.2-3).[1] Plaintiff suffers from multiple sclerosis. *Id.* at PageID.3. In 2009, while housed at the Marquette Branch Prison (MBP), he was diagnosed with "Psychosis disorder due to medical condition." *Id.* Upon plaintiff's transfer to ICF,

---

[1] Plaintiff erroneously refers to Mr. Davis as a psychologist rather than a social worker.

his assigned case manager, Mr. Davis, notified plaintiff that due to his major mental disorder, plaintiff could not be subjected to long-term segregation "and that [p]laintiff would be 'appealed' back into the 'Secure Status Outpatient Treatment Program,' ('SSOTP') for mental health treatment." *Id.* at ¶ 11.

By way of background, the MDOC Policy Directives regarding mentally disabled prisoners in segregation provide that:

> Prisoners with a mental disability ordinarily should not be housed in segregation if the disability may preclude adequate adjustment in segregation. The Department has more appropriate mental health care settings which are designed for the therapeutic management and care of these prisoners; for example, inpatient psychiatric hospitalization, Residential Treatment Programs (RTPs) including the Adaptive Skills Residential Program (ASRP), and the Secure Status Outpatient Treatment Program (SSOTP). Some prisoners with mental disabilities, however, cannot be managed outside of a segregation unit without presenting a serious threat to their own safety or the safety of staff or other prisoners. While in segregation, such prisoners must be closely followed by the institution Outpatient Mental Health Team (OPMHT) or a QMHP to ensure their mental health needs are continuing to be met.

MDOC Policy Directive 04.06.182 ¶ D. The MDOC has summarized outpatient treatment programs, such as SSOTP as follows:

> The Outpatient Mental Health Program (OPMHT) provides mental health treatment to prisoners with a mental disability and/or behavioral disorder that reside in general population. This includes services through a Secure Status Outpatient Treatment Program (SSOTP) which provides a safe and secure alternative treatment option to prisoners with a serious mental disability who, because of behavioral issues which present a risk to the custody and security of the facility, would otherwise be in Administrative Segregation.

*See* (Frequently Asked Questions) ("Health Care - The Rights of Prisoners to Physical and Mental Health Care").[2]

---

[2] Available at http://www.michigan.gov/corrections/0,4551,7-119-9741_12798-208246--,00.html.

Plaintiff was admitted into the mental health program at ICF, but refused treatment. *Id*. at PageID.4. According to plaintiff, he feared the officers who worked with the mentally ill prisoners in the SSOTP unit. *Id.* Later, plaintiff was asked to enter SSOTP on two more occasions, but refused to participate. *Id.* Plaintiff's claims are based on incidents which occurred in July and September 2010.

On July 27, 2010, Mr. Davis went to plaintiff's cell and told plaintiff that if he was not going to consent to participate in SSOTP, then "I'll be sure that you see the doctor." *Id.* When plaintiff stated that he had "a constitutional right to refuse treatment," Mr. Davis left plaintiff's cell and Dr. Ayala came over stating that Davis "referred me to re-evaluate you." *Id.* Plaintiff's meeting with Dr. Ayala "lasted less than three minutes." *Id.* After the meeting, Dr. Ayala changed plaintiff's diagnosis to an anxiety disorder "with no explanation of why he was discontinuing Plaintiff's prescribed treatment and therapy for his Psychosis Disorder." *Id.* According to plaintiff, by changing his diagnosis, Dr. Ayala "made [p]laintiff ineligible for mental health therapy, and subjected [p]laintiff to punitive detention and administrative segregation." *Id.*

On September 22, 2010, Mr. Davis told plaintiff that, according to Dr. Ayala, plaintiff "was ineligible for the mental health program because he refused treatment, not because he [Dr. Ayala] downgraded Plaintiff's diagnosis." *Id.* at PageID.4-5. Mr. Davis later stated that plaintiff was ineligible for both reasons "but more because you were admitted to the SSOTP and you refused to go several times." *Id.* The next day, plaintiff asked Dr. Ayala if the doctor could change his diagnosis back to the original psychosis disorder. *Id.* at PageID.5. Plaintiff promised Dr. Ayala that he would be compliant with treatment and attend SSOTP therapy, because he needed to be provided with proper treatment for his psychosis and released from segregation." *Id.* According to plaintiff,

3

>Defendant AYALA then stated that, the reason he changed Plaintiff's diagnosis was because of Plaintiff's "previous non-compliance" with SSOTP therapy, and that "if your Case Manager agree [sic] to give you a second chance in the SSOTP, I'll be glad to re-consider a more favorable diagnosis." Plaintiff replied "your [sic] the Psychiatrist, you make the diagnosis not my psychologist." Defendant AYALA stated that Defendant DAVIS recommended re-evaluation and that Plaintiff should develope [sic] a better relationship with his psychologist if he want [sic] a favorable diagnosis that will make him eligible for the program.

*Id.*

Plaintiff notified Mr. Davis "numerous times that he will be compliant with treatment and that he was ready to leave segregation because segregation exacerbated the symptoms of his mental illness" and Davis "repeatedly promised that he was going to speak to Dr. Ayala and have Plaintiff's diagnosis corrected." *Id.* at PageID.5-6. However, neither Mr. Davis nor Dr. Ayala corrected "their unlawful actions." *Id.*

Plaintiff does not allege when he transferred from ICF. However, at his deposition, plaintiff testified that he was transferred to MBP in January 2011. Carter Dep. (docket no. 113-3, PageID.752). Approximately four months after his transfer, plaintiff experienced an exacerbation of his multiple sclerosis and severe symptoms of his psychosis. Compl. at PageID.6. On May 29, 2011, plaintiff attempted to commit suicide. *Id.* Dr. Thomas Henry, a psychiatrist, found that plaintiff's "clinical status was worsening" and that plaintiff "suffered from paranoia, delusions, and suicidal behavior, along with sleeping and eating problems." *Id.* Dr. Henry diagnosed plaintiff with a psychosis disorder and recommended that he enter a residential treatment program "for intensive mental health treatment." *Id.* On June 16, 2011, plaintiff was transferred to an inpatient mental health facility and released from segregation. *Id.*

According to plaintiff, Dr. Ayala and Mr. Davis "intentionally downgraded" his diagnosis based on his refusal to enter a mental health program. *Id.* This "downgrade" caused him to be subjected to segregation for 11 months "solely because of Plaintiff's initial refusal to participate in the SSOTP." *Id.* By being subjected to segregation, plaintiff suffered severe mental anguish and emotional pain, which "created a substantial risk of harm to his mental health." *Id.* at PageID.6-7.

Plaintiff's complaint contained two constitutional claims. In Count 1, plaintiff alleged that defendants retaliated against him:

> At all times relevant, pursuant to the 1st Amendment of the United States Constitution, and clearly established law, Plaintiff had a right to engage in constitutionally protected conduct when refusing mental health treatment, and not be subjected to retaliation. Plaintiff suffered an adverse action when Defendants AYALA and DAVIS intentionally downgraded Plaintiff's diagnosis for the sole purpose [sic] to deny him prescribed treatment and subject him to segregation.

*Id.* at PageID.7-8.

In Count 2, plaintiff alleged that defendants were deliberately indifferent to his serious medical needs:

> At all times relevant, pursuant to the 8th Amendment of the United States Constitution, and clearly established law, Plaintiff had a right not to be subjected [sic] cruel and unusual punishment. Defendants AYALA and DAVIS acted with deliberate indifference when denying Plaintiff already prescribed treatment, when they intentionally switched Plaintiff's diagnosis. Defendants AYALA and DAVIS knew Plaintiff was suffering from a "Psychosis Disorder["], knew they were intentionally misdiagnosing Plaintiff, and knew their treatment was otherwise grossly inadequate but proceeded with treatment anyway when treating Plaintiff for an "Anxiety Disorder." Defendants AYALA and DAVIS knew that housing Plaintiff in segregation would increase his risk of relapse and/or exacerbate the symptoms of his mental illness.

*Id.* at PageID.8-9. Plaintiff seeks monetary damages and declaratory relief. *Id.* at PageID.9

5

The Court dismissed plaintiff's First Amendment retaliation claim on the merits and allowed the case to proceed on plaintiff's Eighth Amendment claim. *See* Opinion and Order re Report and Recommendation (R&R) (docket no. 48). In denying motions for summary judgment filed by Mr. Davis and plaintiff, the Court noted that plaintiff's Eighth Amendment claim implicated a Fourteenth Amendment right to refuse medical treatment which the Court could not ignore, and allowed plaintiff to further develop this claim. *See* Opinion and Order re R&R (docket no. 60, PageID.361-362). Discovery has closed. The Court will now review the parties' motions for summary judgment with respect to plaintiff's Eighth Amendment claim alleged in Count II and the Fourteenth Amendment implicated in his complaint.

### II. Motions for summary judgment

#### A. Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

        **B.**        **Plaintiff's "Supplemental Motion for summary judgement and response to defendants Davis and Ayala's motion for summary judgment" (docket no. 122)**

Pursuant to the case management order (docket no. 72), all pretrial motions were due by no later than March 14, 2016. Dr. Ayala filed his motion for summary judgment on that date and the Court granted Mr. Davis an extension of time to file his motion for summary judgment. Plaintiff did not file a timely motion for summary judgment nor did he request an extension of time. However, because it appeared that plaintiff did not understand the Court's procedure for responding to dispositive motions, he was granted an extension to file a response. Order (docket no. 118,

PageID.805-806). Plaintiff filed a short response, which included a "supplemental" motion for summary judgment, in which plaintiff sought to "adopt[] and incorporate[] his original summary judgment motion [docket no. 40], word for word and paragraph by paragraph." Plaintiff's Supplemental Motion (docket no. 122, PageID.823). Plaintiff's "supplemental motion" for summary judgment is untimely and simply incorporates his previous summary judgment motion which the Court denied. *See* Opinion and Order re R&R (docket no. 60). Accordingly, plaintiff's attempt to re-submit this motion for summary judgment as a "supplemental" motion should be denied. The Court will address plaintiff's "response" in conjunction with defendants' motions.

**C.    Plaintiffs' Eighth Amendment claim**

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). Here, the gist of plaintiff's Eighth Amendment claim is that Dr. Ayala and Mr. Davis "switched" plaintiff's diagnosis from "psychosis [sic] disorder" to "anxiety disorder," with the

knowledge that housing plaintiff in segregation "would increase his risk of relapse and/or exacerbate the symptoms of his mental illness."

A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 1. Plaintiff's medical history

On January 23, 2009, per the diagnosis of psychiatrist Dr. Patel, plaintiff was treated for a psychotic disorder due to a medical condition (multiple sclerosis). Dr. Ayala Aff. (docket no.

9

113-2, PageID.741). In a psychiatric examination on November 23, 2009 at MBP, Dr. Patel noted that plaintiff had no history of mental health treatment prior to his incarceration in 2002 or since that time. Dr. Patel Examination (docket no. 110-2, PageID.627). In this regard, the doctor noted that as of 2007, plaintiff had a history of 55 sexual misconducts. *Id*. In November 2009 plaintiff reported having hallucinations. *Id*. At that time, plaintiff was diagnosed with a psychotic disorder due to multiple sclerosis with hallucinations and antisocial personality disorder. *Id*. at PageID.633. Dr. Patel concluded that plaintiff was in need of outpatient mental health treatment. *Id*.

A few weeks later, plaintiff arrived at ICF. Segregation/Admission Case Management Note (Dec. 8, 2009) (docket no. 110-2). During his initial interview with a caseworker, plaintiff reported, among other things, "that he was chosen to speak with the gods," one of whom "informed him of future events." *Id*. Plaintiff made comments during the interview indicating to the case manager that she "could have an inappropriate relationship with him without fear of retribution." *Id*. The case manager was unsure if she could have a therapeutic relationship with plaintiff "due to his preoccupation with sexual acting out." *Id*. The next day, plaintiff underwent a suicide risk evaluation with the case manager. His current suicide risk level was rated as low, with the additional comment that "Psychotic symptoms appear to be exaggerated." *See* Evaluation of Suicide Risk (docket no. 110-2, PageID.635-636).³

While plaintiff was incarcerated at ICF, Dr. Ayala was the psychiatrist who performed evaluations on patients and conducted medication reviews. Dr. Ayala Aff. at PageID.741. According to Dr. Ayala's affidavit, he evaluated plaintiff four times: February 23, 2010; July 27, 2010; September 23, 2010; and December 15, 2010. Dr. Ayala Aff. (docket no. 113-2, PageID.741-

---

³ The Court notes that Mr. Davis became plaintiff's case manager.

742).[4] During the relevant time period, plaintiff was being treated for mental illness through a social worker (i.e., Mr. Davis) and a psychologist, and had been in SSOTP for one month. *Id.* Dr. Ayala opined that plaintiff's mental illness contributed to his repeated episodes of public masturbation which resulted in the misconduct tickets, including a ticket in January 2010 which caused plaintiff to be placed in segregation. *Id.*

During the first evaluation on February 23, 2010, Dr. Ayala noted that plaintiff's present illness included diagnoses of: psychotic disorder due to multiple sclerosis - with hallucinations; antisocial personality disorder; and problems related to interaction with legal system. Medical Record (docket no. 113-4, PageID.767). The doctor noted that plaintiff "prefers to avoid answering simple questions as to his symptoms" and "[i]f left on his own he becomes obsessed with his medical jargon and is difficult to re-direct." *Id.* The doctor did not consider plaintiff's reports of visual hallucinations to be valid (i.e., "he tries very hard to describe them in minute detail and becomes dramatic as if 'on stage'"). *Id.* Nevertheless, the doctor stated that he would "keep an eye on them" because visual hallucinations are common in multiple sclerosis cases with malignant, rapid progression. *Id.* In evaluating plaintiff's mental status, the doctor noted that, "The patient is not exhibiting signs of psychosis. The patient is exhibiting signs of mania." *Id.* at PageID.768.

In May 2010, plaintiff requested to go back to SSOTP, but he refused to attend meetings from June 4 through July 20, 2010. Dr. Ayala Aff. at PageID.741.

Mr. Davis' note from July 20, 2010 states that plaintiff "was quite demanding about getting a TV and accused staff [including Davis] of not wanting to help him as they are refusing to

---

[4] The copy of the affidavit submitted by Dr. Ayala's counsel was barely legible. Counsel is advised that the Court does not consider documents which it cannot read.

let him have a TV despite the fact that he has several years of sanctions and in spite of the fact that he has a pending sexual misconduct." Medical Note (docket no. 110-2, PageID.679). Mr. Davis noted that "Custody will attempt to move him to SSOTP tomorrow, 7/21/10, and he was strongly encouraged to go." *Id*.

That same day, a physician's assistant (PA) adjusted plaintiff's medication. *Id*. at PageID.742. At that time, the PA noted that while plaintiff had a psychosis diagnosis secondary to multiple sclerosis lesions, but that plaintiff "is not exhibiting signs of psychosis." Medical Notes (docket no. 110-2, PageID.680). The PA also noted that information from the case manager revealed that plaintiff had OCD traits (e.g., washing his hands 5 times per hour, twelve hours a day) and discussed with the team psychiatrist of the possibility that plaintiff "is suffering from pre-psychotic brain malfunction." *Id*. The PA was authorized to begin a trial prescription of Abilify, noting that "some studies reveal improvement with psychoses, obsessive compulsive behaviors, and anxieties associated with parkinsons and Alzheimer's diseases"). *Id*.

On the morning of July 27, 2010, Mr. Davis noted that plaintiff was seen by him for about five minutes. Medical Note (docket no. 110-2, PageID.684). Plaintiff denied suicidal ideation but had not consented to participate in the SSOTP program. *Id*.

Some hours later, Dr. Ayala evaluated plaintiff and based on his clinical evaluation and medical opinion, determined that plaintiff no longer met the criteria for psychosis disorder. Ayala Aff. at PageID.742. *Id*. Rather, plaintiff's diagnosis was changed to obsessive compulsive disorder (OCD), mental disorder due to general medical condition, and antisocial personality disorder. *Id*. In his psychiatric evaluation, Dr. Ayala noted that plaintiff was referred to update his diagnostic profile to include new data of Multiple Sclerosis progression, reactivation of OCD and

to formulate an opinion as to the role of his neurological impairment ("'organicity' in his psychiatric symptoms: cause vs. effect"). Psychiatric Evaluation (docket no. 110-2, PageID.685). The examination lasted 60 minutes. *Id*. at PageID.686. At that time, the doctor's clinical assessment changed to: anxiety disorder with obsessive compulsive symptoms due to general medical condition; multiple sclerosis; antisocial personality disorder; obsessive-compulsive personality disorder; and multiple sclerosis. *Id*. at PageID.686.

Mr. Davis performed a routine segregation visit with plaintiff on September 22, 2010. At that time, plaintiff disagreed with his diagnosis, "especially as his current diagnosis makes him ineligible for the SSOTP." Medical Record (docket no. 110-2, PageID.702). Mr. Davis "pointed out to him that he had been admitted to SSOTP recently and he refused to go several times." *Id*.

On September 23, 2010, Dr. Ayala performed an "Annual Psych Med Check." Medical Records (docket no. 113-4, PageID.769). At this time, plaintiff's main concern was his ineligibility for the SSOTP portion of the program. *Id*. After reviewing Mr. Davis' progress notes, Dr. Ayala noted that plaintiff's ineligibility for SSOTP was due "in part at least, on his previous non-compliance, rather than solely due to a recent change of diagnosis as he claims." *Id*. The doctor noted that plaintiff was functioning "at a rather concrete level of intellect, becomes easily confused, but calmer and more re-directable overall." *Id*. Plaintiff was not as obsessively preoccupied and "allows two-way conversations better than before." *Id*. The doctor stated:

> I re-directed him to discuss his wish to return to the SSOTP with his CM [case manager] and if both come to the conclusion that it is worthwhile and possible as a second chance. I'll be glad to reassess and re-consider a more favorable diagnostic re-formulation. In principle – regardless of internal directives – it is my clinical opinion that individuals with a degenerative neurological condition with poor prognosis such as MS, plus criminality and mental illness to boot, are generally in need of more intensive services, regardless of the label assigned to them.

13

*Id*. The doctor diagnosed plaintiff with OCD, mental disorder due to general medical condition, and antisocial personality disorder. *Id*. The doctor also consolidated plaintiff from three antidepressants into two, hoping to find one that was most effective for the patient. *Id*. at PageID.770. Finally, the doctor recorded plaintiff's mental status as follows, "The patient is exhibiting signs of psychosis. No signs of mania." *Id*. at PageID.769.

Dr. Ayala re-evaluated plaintiff on December 15, 2010, and his diagnosis remained the same. *Id*. at PageID.780. The doctor noted that plaintiff had moderate improvement on his new medication, and that he was not exhibiting signs of psychosis or mania. *Id*. In his affidavit, Dr. Ayala explained:

> It is [sic] generally accepted psychiatric principle that an individual's psychiatric diagnosis may change over time with or without treatment. Inmate Carter's diagnosis did exactly that. His change in diagnosis did not change the quality of treatment he would receive only the type of treatment. He was maintained on his medications and his regular visits with social workers and psychologists, the only difference being that he was not enrolled in the SSOTP. . .

Ayala Aff. at PageID.742. Dr. Ayala denied that he changed plaintiff's diagnosis in retaliation for him not attending the SSOTP group sessions. *Id*. at PageID.743.

In January 2011, plaintiff was transferred to MBP. Carter Dep. (docket no. 113-3, PageID.752). On January 21, 2011, plaintiff was under the care of a different physician with the same clinical assessment (i.e., OCD, mental disorder due to medical condition, and antisocial personality disorder). Medical Records at PageID.782-784. An examination by an RN on January 25, 2011, included the same diagnoses. *Id*. at PageID.785-787. On May 28, 2011, more than four months after his transfer to MBP, plaintiff threatened, and then attempted, to hang himself. Clinical Progress Note (docket no. 41-1, PageID.242). The next day, an RN noted that plaintiff was unstable,

complaining of increasing multiple sclerosis symptoms. Mental Health Services Referral (docket no. 41-1, PageID.243). At a psychiatric evaluation on June 1, 2011, Thomas Henry, M.D., noted that plaintiff had the three chronic problems as diagnosed by Dr. Ayala (OCD, mental disorder due to medical condition, and antisocial personality disorder). *Id*. at PageID.244. After reviewing plaintiff's medical history, the doctor speculated that plaintiff's decline was associated with either poor medication compliance or exacerbation of his underlying medical illness. *Id*. at PageID.245. Dr. Henry noted that plaintiff had increased symptoms over the past week, which included suicidal behavior, seemingly associated with increased thought disturbance and psychosis. *Id*. For these reasons, Dr. Henry added a clinical assessment of psychotic disorder NOS. *Id*.

Plaintiff raised two matters in his response to defendants' motions for summary judgment which relate to his medical record. First, plaintiff points out that Mr. Davis previously stipulated that "'psychotic disorder due to general medical condition' (Axis I code 293.81) is on the 2004 list titled 'Major Mental Disorders.'" *See* Davis Response to request (docket no. 122-1, PageID.835). Plaintiff contends that this list is used by prison social workers because prisoners who suffer from mental disorders on this list "are appealed out of segregation" and "placed in general population's therapeutic program called the Secure Status Outpatient Treatment Program." Plaintiff's Response (docket no. 122 at PageID.826). Plaintiff contends that this stipulation is relevant to his lawsuit because it shows that his condition was "downgraded" from psychotic disorder and that he was placed in punitive segregation. *Id*. at PageID.825-826.

Second, plaintiff points out that after his suicide attempt, another psychiatrist, Dr. Surjit Dinsa, found that plaintiff's inappropriate sexual behavior were "symptoms of mania." *Id*. at PageID.825. In his response, plaintiff "stipulates that he exhibited inappropriate sexual behavior"

15

while he was placed in segregation. Plaintiff also submitted Dr. Dinsa's records from July 19, 2011, in which the doctor found that plaintiff suffered from mental disorder due to general medical condition, anti-social personality disorder, OCD, and psychotic disorder NOS. Medical Record (docket no. 122-1, PageID.831). Finally, Dr. Dinsa characterized plaintiff's sexual misconduct as follows:

> Mr. Carter engages in inapproipriate [sic] and excessive mastrubation [sic]. He has dsone [sic] this for years and received misconduct tickets. [N]o other signs and symptoms of mania / hypomania.

*Id*. at PageID.832.

### 2. Plaintiff's claim against Dr. Ayala

The record reflects that Dr. Ayala evaluated plaintiff on four occasions. Contrary to plaintiff's claims, the medical record does not reflect that Dr. Ayala "switched" or "downgraded" his diagnosis to keep him in segregation. The extensive medical record in this case indicates that plaintiff has been under constant treatment, including a re-evaluation of his mental condition on July 27, 2010. The record reflects that this re-evaluation, which plaintiff apparently contends was an intentional misdiagnosis intended to keep him in segregation, arose from the recommendation of the PA who was concerned about plaintiff's OCD symptoms and the relationship of those symptoms to "pre-psychotic brain malfunction." In addition, plaintiff's claim regarding the incidents of July 27, 2010 are unsupported by his own medical records. In his complaint, plaintiff alleged that "[s]hortly after DAVIS left Plaintiff's cell door, Defendant AYALA approached Plaintiff's cell and stated that DAVIS 'referred me to re-evaluate you,'" that the meeting with Dr. Ayala lasted "less than three minutes", and that Dr. Ayala changed plaintiff's diagnosis to "anxiety disorder" with no explanation. The medical record reflects that Mr. Davis met with plaintiff at 7:54 a.m. for about five minutes, that

Dr. Ayala did not meet with plaintiff until four hours later (12:03 p.m.), that Dr. Ayala met with plaintiff for about an hour, and that the purpose of the evaluation was to review new data regarding plaintiff's multiple sclerosis progression and the reactivation of plaintiff's OCD. Medical Records (docket no. 110-2, PageID.684-686).

"[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004), quoting *Westlake*, 537 F.2d at 860 n. 5. The fact that plaintiff disagreed with Dr. Ayala's diagnosis does not raise a constitutional issue. *See Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). Even if the doctor had misdiagnosed plaintiff, this would be negligence, not deliberate indifference to a serious medical need. *See Farmer*, 511 U.S. at 835. Plaintiff's contention that his new diagnosis of anxiety disorder prevented him from attending SSOTP is a red herring; as discussed, plaintiff repeatedly refused to attend SSOTP before Dr. Ayala changed the diagnosis. Finally, plaintiff has not demonstrated that Dr. Ayala was responsible for his attempted suicide in May 2011. Dr. Ayala last saw plaintiff in December 2010. When plaintiff attempted suicide, he was incarcerated at a different correctional facility and under the care of a different psychiatrist for about four months. Plaintiff has failed to demonstrate that Dr. Ayala was deliberately indifferent to his serious medical needs in 2010. For these reasons, Dr. Ayala's motion for summary judgment should be granted with respect to the Eighth Amendment claim.

### 3. Plaintiff's claim against Mr. Davis

Mr. Davis is a Licensed Master Social Worker, employed as a Clinical Social Worker at ICF. Davis Aff. (docket no. 110-2, PageID.622). In his affidavit, Mr. Davis explained his role in providing plaintiff's mental health care:

> My involvement in mental-health care is providing case management conducted through monthly, weekly, or on-demand sessions of varying length, depending on the patient and the need at any given time. I record my observations in the electronic medical record. Dr. Ayala or another provider might rely on those records to get a picture of how a patient is doing over time - trend watching - and that could factor into a diagnosis given. That's the extent of my involvement - making the notes of my observations over time. I do not and did not request that any person change plaintiff's diagnosis.

*Id.* at PageID.623.

Mr. Davis' role as an observer is borne out in the medical records. While Dr. Ayala and the PA reviewed the case manager's notes regarding plaintiff's behavior, it was Dr. Ayala and the PA who diagnosed and medicated plaintiff. Because Mr. Davis did not (and as a licensed social worker could not) change plaintiff's diagnosis or medication, Davis cannot be liable for violating plaintiff's Eighth Amendment rights for "switching" the diagnosis. "Personal involvement is necessary to establish section 1983 liability." *Murphy v. Grenier*, 406 Fed.Appx. 972, 974 (6th Cir. 2011). "It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999). Accordingly, Mr. Davis should be granted summary judgment with respect to the Eighth Amendment claim.

### D.     Plaintiff's Fourteenth Amendment claim

As discussed, the Court broadly construed plaintiff's *pro se* complaint to include a claim that defendants violated his right to refuse medical treatment arising from the Due Process Clause of the Fourteenth Amendment. *See, e.g., Washington v. Harper*, 494 U.S. 210, 221-2, 229 (1990) (recognizing that a prison inmate with a serious mental illness has a constitutionally-protected liberty interest in avoiding the unwanted administration of antipsychotic drugs and concluding that an inmate "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment"); *Noble v. Schmitt*, 87 F.3d 157, 161 (6th Cir.1996) ("[t]he Supreme Court has held that individuals in state custody enjoy protectable liberty interests to be free from bodily restraint, and to refuse medical treatment such as the administration of antipsychotic drugs").

In his brief, Mr. Davis points out that plaintiff has failed to develop such a "right to refuse" claim. *See* Davis Brief (docket no. 110, PageID.619-620). During his deposition, plaintiff testified that he had a right to refuse treatment, which plaintiff defined as refusing to "go into SSOPT [sic]." Carter Dep. at PageID.748. In the Court's opinion, a prisoner's right to refuse to attend outpatient therapy does not rise to the level of a federal constitutional violation. The forced attendance at such therapy is not analogous to the substantial interference with a person's liberty contemplated in *Washington* and *Noble*, e.g., "[t]he forcible injection of [antipsychotic] medication into a nonconsenting person's body . . . to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes." *See Washington*, 494 U.S. at 229. However, even if plaintiff had such a right to refuse to participate in SSOTP, there was no constitutional violation under this theory because plaintiff was not forced to attend SSOTP. On the

contrary, he refused to attend SSOTP. Accordingly, defendants should be granted summary judgment with respect to this claim.[5]

### IV. Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motions for summary judgment (docket nos. 94 and 109) be **GRANTED**, that plaintiff's supplemental motion for summary judgment (docket no. 122) be **DENIED**, and that this action be **DISMISSED**.

Dated: March 8, 2017                 /s/ Ray Kent
                                     RAY KENT
                                     United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

---

[5] Having concluded that defendants did not violate plaintiff's constitutional rights, it is unnecessary to address defendants' other grounds raised for summary judgment.